**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **CAPITAL SUPPRESSION COMPANY,** | : | |
| **LLC, t/a UNIPRO** | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | |
| | : | |
| **MICHAEL KURANT, JACOB WILLIAMS,** | : | |
| **NANCY KURANT and MAXIMUM FIRE** | : | |
| **PROTECTION, LLC** | : | **NO. 19-2759** |

## MEMORANDUM OPINION

**Savage, J.**                                                           **December 19, 2019**

Moving to dismiss this action for lack of personal jurisdiction, the defendants, citizens of Maryland, contend that they do not have sufficient contacts with the Commonwealth of Pennsylvania and have not purposefully directed any conduct at Pennsylvania to justify the exercise of jurisdiction over them.[1]  Capital Suppression Company, LLC, t/a UniPro ("Capital"), the individual defendants' former employer whose principal place of business is in Philadelphia, Pennsylvania, responds that the defendants are subject to personal jurisdiction because they expressly aimed their intentional tortious conduct at Pennsylvania, causing it to feel the brunt of the resulting harm here.

Capital brings this action against three former employees and the company for which they currently work.  It asserts claims arising out of the defendants' alleged misappropriation and retention of confidential and proprietary information and trade

---

[1] The defendants also move for dismissal based on improper venue under 28 U.S.C. § 1406(a) or, in the alternative, transfer to the District of Maryland based on convenience and fairness under 28 U.S.C. § 1404(a).

secrets, and tortious interference with current and prospective customer contracts and business relationships.

We conclude that Capital has not met its burden of establishing the existence of general or specific personal jurisdiction over the defendants. Rather than dismiss the action, we shall transfer it to the United States District Court for Maryland where it could have been brought when it was filed.[2]

## Background

Capital, a limited liability company headquartered in Philadelphia, Pennsylvania, provides fire extinguishers and fire-suppression services in the Mid-Atlantic region. Around February of 2018, Capital expanded its fire-suppression business, purchasing the assets of Chesapeake Uniform Rental, Inc. ("Chesapeake"), a Maryland corporation.[3] At the time of the purchase, defendants Michael Kurant and Jacob Williams were employed by Chesapeake, where Williams worked as a shop technician testing, refilling and certifying fire extinguishers, and Michael Kurant was a manager.[4] They were and remain residents of Dundalk, Maryland.[5]

Shortly after the purchase of Chesapeake, Edward Darcy, Capital's Operations Manager who worked out of Capital's Philadelphia office, conducted telephonic job

---

[2] Because we lack jurisdiction and are transferring the matter pursuant to 28 U.S.C. § 1631, we do not address the defendants' ground for dismissal based on improper venue or their alternative motion seeking transfer of the action to the District of Maryland based on convenience and fairness.

[3] Aff. of Sean O'Reilly (Doc. No. 6-4) ¶¶ 4–6. O'Reilly is Capital's managing member. *Id.* ¶ 2.

[4] Aff. of Michael Kurant (Doc. No. 5-6) ¶ 3; Aff. of Jacob Williams (Doc. No. 5-4) ¶ 3. Michael Kurant had been employed by Chesapeake since February of 2012, and Williams since August of 2015. *Id.*

[5] Michael Kurant Aff. ¶ 2; Williams Aff. ¶ 2.

interviews with Michael Kurant, Williams, and Nancy Kurant.[6]   Capital hired Michael

Kurant and Williams as service technicians, performing on-site inspections, and servicing

portable fire extinguishers, suppression systems and emergency exit lighting exclusively

in Maryland.[7]   Capital hired Nancy Kurant in June of 2018 as a service technician and

Michael Kurant's assistant.   They were informed that Capital was a Pennsylvania

company and that their work would be directed from, generated in and supervised from

the Philadelphia office.[8]

Darcy met with each individual defendant in Maryland to review Capital's

procedures and the company's expectations.   He told them that he would be their

supervisor and his office was located in Philadelphia.[9]   He also discussed with Michael

Kurant and Williams the terms of the non-compete agreement they had signed, including

the provision stating that it "is to be governed and construed according to the law of the

State of Pennsylvania."[10]   Darcy's supervision of the individual defendants involved daily

phone calls from his Philadelphia office to them in Maryland.   He also made weekly

personal visits in Maryland.[11]

The individual defendants also had daily contact via phone and email with another

Philadelphia office employee, Anila Saraci, who maintained and updated Capital's

---

[6] Aff. of Edward Darcy (Doc. No. 6-5) ¶¶ 2, 7–8.

[7] Michael Kurant Aff. ¶¶ 3, 13–14; Williams Aff. ¶¶ 3, 12–13.

[8] O'Reilly Aff. ¶ 11.

[9] Darcy Aff. ¶¶ 4–5, 10, 14.

[10] O'Reilly Aff. ¶ 12; Darcy Aff. ¶ 11; Non-compete/Non-disclosure agreements (Doc. No. 6-4) at ECF 9, 12, ¶ 9.

[11] Darcy Aff. ¶ 31.

customer lists and scheduled the defendants' customer site visits. From customer leads developed by the Philadelphia office, Saraci generated an invoice for each appointment, which included the customer's name and address, appointment date and time, description of the service to be provided, and the cost of the service. The individual defendants communicated daily with Saraci[12] about the status of customer appointments, pricing and other customer questions. When appointments were completed, they emailed the customer invoice to Saraci.[13] Capital used these daily reports to track sales, services and inventory, order supplies and equipment, and monitor employee performance.[14]

In addition to mailing supplies and equipment to the individual defendants in Maryland, Capital's Philadelphia office provided Michael Kurant and Williams each a van that served as a mobile work station for their daily site visits. The vans were registered and insured at Capital's Philadelphia address. Capital paid for the vehicles' maintenance and service. The Philadelphia office provided the equipment and supplies to stock the vans.[15]

The individual defendants submitted requests for pay and commissions to Capital's Philadelphia office. Their salary and commission payments were sent from Philadelphia, and company benefits were administered in Philadelphia.[16]

---

[12] Saraci's phone number at Capital had a "215" area code, which is a Philadelphia area code. Pl.'s Br. (Doc. No. 6) at 5.

[13] Aff. of Anila Saraci (Doc. No. 6-7) ¶¶ 5–17; Darcy Aff. ¶¶ 14–18.

[14] Darcy Aff. ¶¶ 25–26.

[15] Darcy Aff. ¶¶ 20, 27–28; O'Reilly Aff. ¶¶ 20–23.

[16] Darcy Aff. ¶ 32; O'Reilly Aff. ¶¶ 34–35.

While employed by Capital, Michael Kurant and Williams were present in Pennsylvania on a few occasions. Each time it was at the direction of and for the benefit of Capital. On April 2, 2018, Michael Kurant and Williams each drove a van from Maryland to Philadelphia and back to Maryland to have the vehicles titled and registered in Pennsylvania.[17] Williams traveled to Pennsylvania twice more in connection with his employment with Capital. Once, he went to York, Pennsylvania, to service life safety equipment. The last time, he drove a van to Philadelphia to be recertified.[18]

Around October of 2018, Michael Kurant resigned from his job. Shortly thereafter, Capital terminated Nancy Kurant's employment.[19] On May 3, 2019, when Williams last drove the van to Philadelphia, Capital terminated his employment and gave him train fare to return to Maryland.[20]

Michael Kurant had formed Maximum Fire Protection, LLC ("Maximum"), a fire suppression business, in July of 2018, more than two months before he resigned from Capital.[21] Maximum is a limited liability company formed in Maryland and registered to do business only in Maryland.[22] Maximum has four employees, all of whom are domiciled in Maryland.[23]

---

[17] Michael Kurant Aff. ¶ 13; Williams Aff. ¶ 12; Darcy Aff. ¶ 23.

[18] Williams Aff. ¶ 12.

[19] Compl. ¶ 18; Nancy Kurant Aff. ¶ 3.

[20] O'Reilly Aff. ¶ 33; Darcy Aff. ¶ 40.

[21] *See* Maximum's Corporate Filing (Doc. No. 1-1) at ECF 4.

[22] Aff. of Michael Kurant as Corporate Representative of Maximum ("Maximum Aff.") (Doc. No. 5-3) ¶¶ 2–3; Compl. ¶ 7.

[23] Maximum Aff. ¶¶ 3–4; Compl. ¶ 7.

Capital claims that the individual defendants conspired to actively solicit Capital's customers and induce them to move their business to Maximum. It alleges that Michael Kurant misappropriated Capital's proprietary and confidential information, including its customer lists and pricing information,[24] to undercut Capital's prices, and induced Capital's customers to terminate their contractual relationships with Capital and enter into contracts with Maximum.[25] It further alleges that Williams, while still employed by Capital, aided Michael Kurant and Maximum by using Capital's mobile van and equipment to service former Capital customers as customers of Maximum.[26]

Capital asserts seven claims. They are tortious interference with Capital's contractual relations; tortious interference with Capital's prospective contractual and business relationships; misappropriation of trade secrets; unfair competition; conversion; and civil conspiracy, and a request for accounting. Except for the accounting claim, all are intentional torts.

## Personal Jurisdiction Standards

Once a defendant challenges personal jurisdiction, the plaintiff bears the burden of proving, by a preponderance of the evidence, facts establishing a basis for the exercise of jurisdiction. *Metcalfe v. Renaissance Marine, Inc.*, 566 F.3d 324, 330, 336 (3d Cir. 2009) (citing *Carteret Sav. Bank, F.A. v. Shushan*, 954 F.2d 141, 146 (3d Cir. 1992)). In

---

[24] The proprietary information was contained in the customer invoices that Saraci sent to the individual defendants to enable them to perform their site visits. The invoices contained the customer's name, address, service to be provided and price of the service.

[25] Compl. ¶¶ 2(a), 21–23. Capital also alleges Michael Kurant misappropriated their proprietary information to solicit prospective customers of Capital to become customers of Maximum instead of Capital. Compl. ¶ 2(b).

[26] Compl. ¶¶ 2(a)–(c), 24–27; Darcy Aff. ¶¶ 35–36. Capital states that it fired Williams once it learned that he was doing this. Compl. ¶ 25.

considering a motion to dismiss for lack of personal jurisdiction under Federal Rule of Civil Procedure 12(b)(2), as we do with a motion to dismiss for failure to state a claim under Rule 12(b)(6), we accept as true the plaintiff's allegations and draw all reasonable inferences in favor of the plaintiff. *Shuker v. Smith & Nephew, PLC*, 885 F.3d 760, 780 (3d Cir. 2018) (citing *O'Connor v. Sandy Lane Hotel Co.*, 496 F.3d 312, 316 (3d Cir. 2007)). However, unlike with Rule 12(b)(6), the scope of review under Rule 12(b)(2) is not limited to the face of the pleadings. *Patterson by Patterson v. FBI*, 893 F.2d 595, 603–04 (3d Cir. 1990) (citation omitted) (holding Rule 12(b)(2) motion is "inherently a matter which requires resolution of factual issues outside the pleadings"). Once a defendant challenges personal jurisdiction, the plaintiff must "prove by affidavits or other competent evidence" that jurisdiction is proper. *Metcalfe*, 566 F.3d at 330 (citation omitted).

When the parties do not conduct jurisdictional discovery and there is no evidentiary hearing, the plaintiff need only establish a *prima facie* case of personal jurisdiction. *Shuker*, 885 F.3d at 780. To determine whether the plaintiff has made this *prima facie* showing, we assume all factual allegations in the affidavits and other evidence submitted to be true and construe all factual disputes in the plaintiff's favor. *Metcalfe*, 566 F.3d at 331, 333.[27]

There are two types of personal jurisdiction, general and specific. The focus of general jurisdiction is on the relationship between the defendant and the forum state, not

---

[27] If the alleged jurisdictional facts remain in dispute later in the litigation, we are free to "revisit[]" the jurisdictional question. *Shuker*, 885 F.3d at 781 (citing *Metcalfe*, 566 F.3d at 331, 336). At this later stage, instead of construing the evidence in plaintiff's favor, we consider the evidence presented by both parties and decide the factual disputes in light of the plaintiff's burden to establish jurisdiction by a preponderance of the evidence. *Metcalfe*, 566 F.3d at 331, 336 (citing *Carteret*, 954 F.2d at 142 n.1).

on the relationship of the claims to the forum. *Bristol-Myers Squibb Co. v. Superior Court of California, San Francisco Cty.*, 137 S. Ct. 1773, 1780 (2017) (citing *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011)). The specific jurisdiction inquiry focuses on the relationship of the litigation to the defendant's contacts with the forum. *Walden v. Fiore*, 571 U.S. 277, 284 (2014).

Before exercising personal jurisdiction over a nonresident, a district court must conduct a two-step analysis. *Eurofins Pharma US Holdings v. BioAlliance Pharma SA*, 623 F.3d 147, 155 (3d Cir. 2010). First, there must be a statutory basis under the law of the forum state for exercising jurisdiction. *Walden*, 571 U.S. at 283 (citing *Daimler AG v. Bowman*, 571 U.S. 117, 125 (2014)); Fed. R. Civ. P. 4(k)(1)(A). Second, the nonresident must have sufficient minimum contacts with the forum state to satisfy constitutional due process. *BNSF Ry. Co. v. Tyrrell*, 137 S. Ct. 1549, 1558 (2017).

*Statutory Basis for Jurisdiction*

Pennsylvania's long-arm statute supplies several bases for personal jurisdiction over a nonresident defendant. 42 Pa. Cons. Stat. Ann. §§ 5301, 5322; *Pennzoil Prods. Co. v. Colelli & Assocs., Inc.*, 149 F.3d 197, 200 & n.1 (3d Cir. 1998). Section 5301 provides for general jurisdiction over an individual defendant who was domiciled or present in the state at the time of service of process, or who consents to suit. 42 Pa. Cons. Stat. Ann. § 5301(a)(1)(i)–(iii). General jurisdiction exists over an unincorporated association that was formed as a Pennsylvania entity, is a foreign company registered to do business in Pennsylvania, carries on "a continuous and systematic part" of its business in Pennsylvania, or consents to suit. *Id.* § 5301(a)(3)(i)–(iii). When personal jurisdiction is premised on this section of the Pennsylvania long-arm statute, any cause of action may

be asserted against the defendant whether or not it arises from acts forming the basis of jurisdiction. *Id.* § 5301(b).

The statute's "tort out/harm in" provision confers specific jurisdiction over anyone who "[c]aus[es] harm or tortious injury in th[e] Commonwealth by an act or omission outside th[e] Commonwealth." *Id.* § 5322(a)(4); *Pennzoil*, 149 F.3d at 200 n.1. Additionally, section 5322(b) provides that specific jurisdiction extends "to all persons who are not within the scope of section 5301 . . . to the fullest extent allowed under the Constitution of the United States and may be based on the most minimum contact with this Commonwealth allowed under the Constitution of the United States." 42 Pa. Cons. Stat. Ann. § 5322(b). Under this section, only causes of action arising from the defendant's contacts with the forum may be asserted. *Id.* § 5322(c).

*Minimum Contacts with Pennsylvania*

A statutory basis for the exercise of personal jurisdiction alone is not sufficient. The exercise of jurisdiction must also be consistent with the limits imposed by the Due Process Clause of the Fourteenth Amendment. *Walden*, 571 U.S.at 283 (citing *Daimler*, 571 U.S. at 125). To meet this standard, the plaintiff must establish that "certain minimum contacts" exist between the nonresident defendant and the forum so that the exercise of jurisdiction will "not offend 'traditional notions of fair play and substantial justice.'" *Tyrrell*, 137 S. Ct. at 1558 (quoting *Int'l Shoe Co. v. Wash.*, 326 U.S. 310, 316 (1945)).

General jurisdiction over a foreign corporation, partnership or unincorporated entity exists where its "affiliations with the [forum] State are so 'continuous and systematic' as to render [it] essentially at home" there. *Id.* at 1558 (quoting *Daimler*, 571 U.S. at 127). "[O]nly a limited set of affiliations with a forum will render a defendant amenable to general

jurisdiction" there. *Bristol-Myers Squibb*, 137 S. Ct. at 1780 (quoting *Daimler*, 571 U.S. at 137). The "paradigm forum" for the exercise of general jurisdiction over a corporation is where it is incorporated and has its principal place of business;[28] for an individual, it is the individual's domicile. *Daimler*, 571 U.S. at 137 (quoting *Goodyear*, 564 U.S. at 924). Once these contacts are established, the defendant can be answerable for any claim even if the subject matter of the cause of action has no relationship to the forum. *Bristol-Myers Squibb*, 137 S. Ct. at 1780 (citing *Goodyear*, 564 U.S. at 919).

Specific jurisdiction arises when the cause of action is related to or arises out of the defendant's contacts with the forum and the plaintiff's injury in the forum is related to those contacts. *Bristol-Myers Squibb*, 137 S. Ct. at 1780 (quoting *Daimler*, 571 U.S. at 127). The specific jurisdiction inquiry "focuses on the relationship among the defendant, the forum, and the litigation." *Walden*, 571 U.S. at 283–84 (quoting *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 775 (1984) (internal quotations omitted)).

The "traditional test" for the exercise of specific jurisdiction over a nonresident defendant has three requirements. First, the defendant's conduct must have been purposefully directed at the forum state, resulting in contacts with the forum. *J. McIntyre Mach., Ltd. v. Nicastro*, 564 U.S. 873, 881, 883 (2011) (minimum contacts requires "contact with and activity directed at" the forum state) (citations omitted). Second, the plaintiff's claim must arise out of or relate to those contacts. *Walden*, 571 U.S. at 284 (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985). Third, if the first two requirements are met, the court considers whether the exercise of jurisdiction otherwise

---

[28] "The exercise of general jurisdiction is not limited to these fora. In an 'exceptional case,' a corporate defendant's operations in another forum 'may be so substantial and of such a nature as to render the corporation at home in that State.'" *Tyrrell*, 137 S. Ct. at 1558 (quoting *Daimler*, 571 U.S. at 137–39 & n.19).

comports with "fair play and substantial justice." *D'Jamoos ex rel. Estate of Weingeroff v. Pilatus Aircraft Ltd.*, 566 F.3d 94, 102 (3d Cir. 2009) (quoting *Burger King*, 471 U.S. at 476).

The first two requirements assess whether a defendant has the requisite minimum contacts with the forum. Although the purposeful direction requirement does not require physical presence in the forum, it does require that the defendant created the contacts with the forum state. *Walden*, 571 U.S. at 284–85 (citing *Burger King*, 471 U.S. at 475–76). The defendant's contacts must be with the forum state itself, not just "with persons who reside there." *Walden*, 571 U.S. at 285 (citing *Int'l Shoe*, 326 U.S. at 319). In other words, "the plaintiff cannot be the only link between the defendant and the forum. Rather, it is the defendant's conduct that must form the necessary connection with the forum State that is the basis for its jurisdiction over him." *Walden*, 571 U.S. at 285–86 (citing *Burger King*, 471 U.S. at 478).

The relatedness requirement demands a causal connection between the defendant's activities and the effects of that activity in the forum. *Walden*, 571 U.S. at 284. The relationship among the defendant, the forum, and the litigation "must arise out of contacts that the 'defendant *himself*' creates with the forum State." *Id.* (citing *Burger King*, 471 U.S. at 475) (emphasis in original). There must be an "affiliation between the forum and the underlying controversy" that is connected to the defendant's conduct. *Bristol-Myers Squibb*, 137 S. Ct. at 1780 (quoting *Goodyear*, 564 U.S. at 919).

The plaintiff's contacts are not relevant. Only the defendant's contacts are analyzed. Thus, no matter how significant the plaintiff's contacts are, they are not

"decisive in determining whether the defendant's due process rights are violated." *Walden*, 571 U.S. at 285 (quoting *Rush v. Savchuk*, 444 U.S. 320, 332 (1980)).

Once a plaintiff has met its burden of showing the defendant has "minimum contacts" with the forum state, the exercise of jurisdiction is presumed constitutional, and the burden shifts to the defendant to "present a compelling case that the presence of some other considerations would render jurisdiction unreasonable." *O'Connor,* 496 F.3d at 324 (quoting *Burger King*, 471 U.S. at 477). The relevant factors to consider in the fair play analysis include "the burden on the defendant," "the forum State's interest in adjudicating the dispute," "the plaintiff's interest in obtaining convenient and effective relief," "the interstate judicial system's interest in obtaining the most efficient resolution of controversies," and the "shared interest of the several States in furthering fundamental substantive social policies." *Burger King*, 471 U.S. at 477 (quoting *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 292 (1980).[29]

If, under the "traditional test," a defendant lacks sufficient contacts with the forum to comport with the requirements of due process, it may still be subject to jurisdiction under the *Calder* "effects test." *See Calder v. Jones*, 465 U.S. 783 (1984). *Calder* recognizes that, in certain circumstances, the relationship among the defendant, the forum, the plaintiff and the intentional tort may render a defendant's otherwise insufficient contacts with the forum under the "traditional test" sufficient. *IMO Indus., Inc. v. Kiekert AG*, 155 F.3d 254, 260, 265 (3d Cir. 1998). Unlike the "traditional test," which requires a defendant to have made direct contacts with or in the forum, minimum contacts can be

---

[29] Because we conclude that Capital does not meet its burden of demonstrating the defendants' minimum contacts with Pennsylvania, we do not reach this prong of the test.

established under *Calder* if the plaintiff's injury, which was caused by the defendant's conduct outside the forum, connects the defendant's conduct to the forum, not just to the plaintiff. *Walden*, 571 U.S. at 288.

In *Calder*, a California resident brought a claim in California state court against the author and the editor of an allegedly libelous article and their employer newspaper. The individual defendants were domiciled in Florida where they researched, wrote and edited most of the article. The defendant newspaper was a Florida corporation with its principal place of business there. The article

> concerned the California activities of a California resident, . . . impugned the professionalism of an entertainer whose television career was centered in California . . . [and] was drawn from California sources, and the brunt of the harm, in terms both of [the plaintiff's] emotional distress and the injury to her professional reputation, was suffered in California.

*Calder*, 465 U.S. at 788–89.

The Court found the defendants knew that the article would have a "potentially devastating impact" on the plaintiff's reputation and the "brunt of that injury would be felt by [the plaintiff] in the State in which she lives and works and in which the [newspaper] has its largest circulation." *Id.* at 789–90. Additionally, the injury to the plaintiff's reputation would not have occurred absent a large number of California citizens reading the article. In this way, the "effects" on the plaintiff caused by the defendants' conduct outside California connected the defendants' conduct to California, not just to the plaintiff. *Walden*, 571 U.S. at 288 (citing *Calder*, 465 U.S. at 789–90). Based on these facts, the Court found that California was "the focal point both of the story and of the harm suffered." *Calder*, 465 U.S. at 789. Concluding that the defendants' "intentional, and allegedly

tortious, actions were expressly aimed at California," it held that jurisdiction over the defendants in the forum was proper. *Id.*, 465 U.S. at 789, 791.

The Third Circuit has articulated the *Calder* "effects test" as requiring a plaintiff to show the following:

> (1) the defendant committed an intentional tort;
>
> (2) the plaintiff felt the brunt of the harm [caused by that tort] in the forum, such that the forum can be said to be the focal point of the harm suffered by the plaintiff as a result of that tort; [and]
>
> (3) the defendant expressly aimed his tortious conduct at the forum, such that the forum can be said to be the focal point of the tortious activity.

*IMO Indus.*, 155 F.3d at 256, 265–66.

To establish minimum contacts under the *Calder* "effects test," the forum must have been the focal point of both the tortious conduct and the harm suffered. *Walden*, 571 U.S. at 287 (quoting *Calder*, 465 U.S. at 789). The defendant must have expressly aimed his tortious activity at the forum, knowing that the effects of its conduct were likely to be felt by the plaintiff there *and* making the forum the focal point of its conduct.

The third prong of this test can only be satisfied "if the plaintiff can point to contacts which demonstrate that the defendant *expressly aimed* its tortious conduct at the forum." *IMO Indus.*, 155 F.3d at 265 (emphasis in original). It is not enough that the defendant's conduct affects a plaintiff who is connected to the forum state, or that the plaintiff experienced or felt the injury or effect of the defendant's conduct in the forum. *Id.* at 290 ("mere injury to a forum resident is not a sufficient connection to the forum" to satisfy *Calder*); *IMO Indus.*, 155 F.3d at 263. The "effects" of the tortious conduct must connect the defendant to the forum, not just to the plaintiff. *Walden*, 571 U.S. at 287. "The proper

question is . . . whether the defendant's conduct connects him to the forum in a meaningful way." *Id.* at 290.  Thus, through his intentional conduct, "it is the defendant, not the plaintiff . . . , who must create contacts with the forum State."  *Id.* at 286, 291.

Because *IMO* involved the Third Circuit's first application of *Calder* to a business tort, it examined approaches taken by other circuits that had applied *Calder* to business torts.  *IMO Indus.*, 155 F.3d at 261–64.  It rejected the minority view that under *Calder* a court can "automatically infer" that a defendant expressly aimed its tortious conduct at the forum just because the defendant knew that the plaintiff resided in the forum and would feel the brunt of the harm caused by its conduct there.  Noting that all companies "feel" lost sales at their headquarters, the court observed that such a broad construction of *Calder* in intentional business tort cases would mean that jurisdiction would always be appropriate in the plaintiff's home state.  *IMO Indus.*, 155 F.3d at 263 (citation omitted).  Instead, it adopted a narrower construction of the *Calder* test held by the majority of circuits to consider its application to intentional business torts.  Under this view, in addition to showing that the defendant knew the plaintiff would feel the brunt of the harm caused by its tortious conduct in the forum, the plaintiff must point to specific conduct by the defendant that was intentionally targeted at and focused on the forum.  *Id.* at 265–66.

## Analysis

### *General Jurisdiction*

Capital asserts that there is a basis for exercising both general and specific jurisdiction over the defendants.[30]  In support of general jurisdiction, it argues that the

---

[30] Pl.'s Br. at 12, 16.

individual defendants had "continuous and substantial contacts" with Pennsylvania. They include:

- When Darcy interviewed them, he told them that they would be employees of a Pennsylvania company and their work would be directed from, generated in and supervised from the Philadelphia office.

- Once hired, Darcy met with each individual defendant in Maryland to review Capital's procedures, and discussed with Michael Kurant and Williams the terms of the non-compete agreement they had signed, including the provision stating that it "is to be governed and construed according to the law of the State of Pennsylvania."

- While supervising them, Darcy called them several times a day from his office in Philadelphia.

- Capital employees from the Philadelphia office communicated daily with the individual defendants via phone and email, sending them appointment invoices the individual defendants completed and returned.

- The individual defendants submitted requests for pay and commissions to Capital's Philadelphia office.

- The individual defendants used Capital's customer lists and pricing information, which were maintained in its Philadelphia office.

- The individual defendants used Capital's mobile vans, which were registered in Pennsylvania, and the vans' equipment and supplies that were provided by Capital's Philadelphia office, to service Capital customers.[31]

Based on these contacts, Capital contends that the individual defendants "were acutely aware" that "all of their work was generated, controlled, directed and supervised by Capital in Philadelphia," and the "entirety of Defendants' employment with Capital was centered on their daily communications and interactions" with Capital's Philadelphia office. Capital argues that the individual defendants "derived substantial economic

---

[31] *Id.* at 13–15.

benefits" from their "continuous and systematic contacts" with and in Pennsylvania, and therefore "have purposefully availed themselves to the laws of this jurisdiction."[32]

These contacts are not sufficient to provide a basis for the exercise of general jurisdiction over the defendants under the Pennsylvania long-arm statute. None of the individual defendants is domiciled or was present in Pennsylvania when served, or consented to suit. As to Maximum, it is not a Pennsylvania entity, is not registered to do business in Pennsylvania, does not carry on "a continuous and systematic part" of its business in Pennsylvania,[33] and has not consented to suit.[34]

*Specific Jurisdiction*

In support of the exercise of specific jurisdiction, Capital contends that the defendants had "extensive" contacts with the forum that are related to the claims. The contacts fall into essentially three categories: (1) phone and email communications with Capital employees in Philadelphia when transmitting customer invoices and exchanging other information regarding customer site visits; (2) misappropriation of Capital's proprietary customer and pricing information, which was maintained in the Philadelphia office, to lure current and prospective customers of Capital to Maximum; and (3) use of

---

[32] *Id.* at 12, 15–16. Although it *asserts* that "based on Defendants' continuous and substantial contacts with the Commonwealth of Pennsylvania, this Honorable Court has general jurisdiction over all Defendants," *see id.* at 12, Capital makes no *argument* in support of general jurisdiction over Maximum.

[33] Capital's argument that the individual defendants' purported "continuous and systematic" contacts is a basis for jurisdiction is misplaced. This standard applies to corporations and other similar entities, not individuals.

[34] Because no statutory basis for exercising general jurisdiction over the defendants has been established, we need not proceed to the second step of the analysis to determine whether the exercise of general jurisdiction would comport with federal due process.

its mobile vans, which were registered in Pennsylvania, to service former Capital customers in order to divert them to Maximum.[35]

For a statutory basis for the exercise of specific jurisdiction, Capital cites the provision of the Pennsylvania long-arm statute that confers jurisdiction over a nonresident who causes "harm or tortious injury in [Pennsylvania] by an act or omission outside" of the state. 42 Pa. Cons. Stat. Ann. § 5322(a)(4).[36] It argues that the requirements of constitutional due process are met under both the "traditional test" and the *Calder* "effects test" because the defendants "purposefully directed" and "expressly aimed" their tortious conduct at Pennsylvania and knew it would cause Capital to feel the resulting economic harm in Philadelphia where it was headquartered.[37]

Capital has established a statutory basis for the exercise of specific jurisdiction over the defendants. Under section 5322(a)(4) of Pennsylvania's long-arm statute, a nonresident whose actions outside of Pennsylvania cause harm inside the Commonwealth is subject to jurisdiction. Capital alleges that the defendants' conduct in Maryland in stealing its customers caused it to suffer an economic injury, which it "felt" in Pennsylvania where it is headquartered.

Capital has not shown that there is specific jurisdiction under either the "traditional test" or the *Calder* "effects test." Under both tests, the defendant's "suit-related conduct must create a substantial connection with the forum State," and the defendant's contacts must be with the forum state itself, not just "with persons who reside there." *Walden*, 571

---

[35] Pl.'s Br. at 18–19.

[36] *Id.* at 9, 21.

[37] *Id.* at 18–24.

U.S. at 284–86, 290–91.  The defendants' contacts, taken alone or together, do not meet these requirements.

Capital does not identify any tortious conduct that the defendants purposefully directed at Pennsylvania.  It relies on contacts with the defendants that it created in Pennsylvania.  It has not pointed to a single contact that the defendants themselves created here.  Capital is the only link between the defendants and Pennsylvania.  Indeed, Capital has not identified any tortious acts that occurred in Pennsylvania.

When the individual defendants communicated with Capital employees in the Philadelphia office via phone and email, they were carrying out their job duties.  Those communications were required and directed by Capital.  The defendants were not "purposefully directing" or "expressly aiming" their conduct at Pennsylvania.  These contacts were not related to their alleged tortious conduct.

Any misappropriation of Capital's proprietary information was not aimed at Pennsylvania.  Capital alleges that the individual defendants stole its confidential customer and pricing information, which was maintained and updated in the Philadelphia office, and used it to steal Capital's current and prospective customers.  Because the defendants received the proprietary information from Capital in the course of doing their job duties in Maryland,[38] the defendants did not target their conduct at Pennsylvania to obtain Capital's proprietary information.  The identity of Capital's customers was revealed in customer invoices, which listed each customer's name, address, service to be provided and price of the service.  Saraci, a Capital employee in Philadelphia, sent the customer

---

[38] Indeed, Capital concedes that the individual defendants "came into possession of Capital's confidential . . . customer list and pricing information during their employment with a Pennsylvania company."  *Id.* at 24.

invoices to the individual defendants to service Capital's customers in Maryland. With respect to the defendants' alleged use of the proprietary information to lure current and prospective customers of Capital to Maximum, any tortious conduct took place outside of Pennsylvania, where all of the defendants and their target customers were located. In short, the defendants received and used the proprietary information in Maryland, not Pennsylvania.

Michael Kurant and Williams did not purposefully direct their activities at Pennsylvania when they allegedly used Capital's mobile van and supplies to service former Capital and current Maximum customers. Neither they nor any customers were in Pennsylvania.

Capital has failed to identify any conduct that the defendants purposefully directed at Pennsylvania that is related to the claims asserted against them. The few contacts the defendants had with Pennsylvania were initiated by Capital's employees, who directed the communications from Pennsylvania *toward* the *defendants* in *Maryland*. These contacts are insufficient to demonstrate that the defendants' conduct was purposefully directed at the forum. The defendants' contacts must be with the forum state itself, not just "with persons who reside there." *Walden*, 571 U.S. at 284–86. Capital has not demonstrated that its claims arise out of conduct the defendants directed at Pennsylvania. Hence, the defendants lack sufficient minimum contacts with Pennsylvania under the "traditional test."

Because Capital asserts intentional tort claims, we apply the *Calder* "effects test." Capital also fails this test.

Capital has satisfied the first and second prongs of the *Calder* "effects test." It asserts that the defendants committed several intentional torts. It alleges that the defendants' conduct caused it to suffer an economic injury as a result of the defendants poaching its customers and their misuse of its supplies and equipment. It contends that Pennsylvania was "the focal point of the harm" it suffered because Capital is headquartered in Pennsylvania where it felt the economic harm arising from the torts.[39]

It is the third element where Capital fails. Capital has not shown that the defendants "expressly aimed" their tortious conduct at Pennsylvania, making *the forum* the target of their tortious activity. It merely contends that because the defendants knew it was headquartered in Philadelphia, they intended to harm it in Pennsylvania, making their conduct "expressly aimed" at the forum.[40] In this case, the alleged intentional tortious acts occurred in Maryland where the defendants targeted customers. That the defendants knew that any harm they caused would be felt by Capital in Pennsylvania is not enough to demonstrate that the harm connects the defendants' conduct to *the forum*. Thus, Maryland, not Pennsylvania, was the focal point of the tortious conduct.

In summary, Capital has failed to meet its burden to demonstrate that there is a basis for the exercise of specific jurisdiction under either the "traditional test" or the *Calder* "effects test." It does not identify any tortious conduct that the defendants purposefully directed at Pennsylvania or contacts with the forum that the defendants created as required by the "traditional test." Capital points only to contacts with the defendants which were initiated by Capital's employees in Pennsylvania and directed toward the defendants

---

[39] *Id.* at 22–23.

[40] *Id.* at 23–25.

in Maryland. It does not point to contacts that the defendants themselves created in Pennsylvania. Because the defendant's contacts must be with the forum state itself, not just "with persons who reside there," *Walden*, 571 U.S. at 284–86, these contacts are insufficient to demonstrate that the defendants' conduct was purposefully directed at the forum to meet the minimum contacts required under the "traditional test."

It has also failed to identify contacts showing that the defendants "expressly aimed" their tortious conduct at Pennsylvania, making the forum the target of their tortious activity as required by the *Calder* "effects test." Maryland was the focal point of the tortious conduct. That is where the defendants targeted customers. Capital's assertions that the defendants knew it was headquartered in Philadelphia and intended to harm it there are insufficient to show that their conduct was "expressly aimed" at the forum. Thus, Capital has not satisfied the *Calder* "effects test" to establish specific jurisdiction.

## Conclusion

Capital has not met its burden of establishing a basis to exercise personal jurisdiction over the defendants. There is no general or specific jurisdiction over the defendants. None of the defendants was present or domiciled in Pennsylvania at the time of service, or gave consent to suit. Because Maximum is not a domestic or foreign Pennsylvania entity, does not consent to suit and lacks "continuous and systematic contacts" with Pennsylvania, it does not fit in any category of section 5301(a)(3) sufficient to confer general jurisdiction over it. Nor has Capital met its burden to show that the requirements of specific jurisdiction under either the "traditional test" or the "*Calder* effects test" are met. The defendants did not "purposefully direct their activities at" Pennsylvania and their contacts with Pennsylvania did not arise out of their allegedly tortious conduct.

Capital has not shown sufficient evidence of contacts with Pennsylvania demonstrating that the defendants "expressly aimed" their tortious conduct at Pennsylvania. Therefore, we shall grant the defendants' motion to the extent that it raises lack of personal jurisdiction.

Rather than dismiss the action, pursuant to 28 U.S.C. § 1631, we shall, in the interest of justice, transfer the case to the United States District Court for Maryland, where this action could have been brought when it was filed.

/s/ TIMOTHY J. SAVAGE J.